WINSTON & STRAWN LLP
The Legal Center
One Riverfront Plaza, Suite 730
Newark, New Jersey 07102
(973) 848-7676
James S. Richter
Melissa Steedle Bogad

Attorneys for Defendant
LG Electronics USA, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ———————————————— x | |
| | : |
| **IN RE LG FRONT LOAD WASHING** | : Honorable Faith S. Hochberg, U.S.D.J. |
| **MACHINE CLASS ACTION** | : |
| **LITIGATION** | : Case No. 2:08-cv-00051-FSH-MAS |
| | : |
| | : **DECLARATION OF MELISSA STEEDLE** |
| | : **BOGAD IN SUPPORT OF LG USA'S** |
| | : *DAUBERT* **MOTION TO EXCLUDE OPINIONS** |
| | : **AND TESTIMONY OF PLAINTIFFS'** |
| | : **EXPERTS** |
| | : |
| | : **Electronically Filed** |
| | : |
| | : **Oral Argument Requested** |
| | : |
| | : **Return date:  June 6, 2011** |
| | : |
| ———————————————— x | |

MELISSA STEEDLE BOGAD, of full age, hereby declares as follows:

1.     I am an attorney at law of the State of New Jersey and an associate with Winston & Strawn LLP, attorneys for Defendant LG Electronics USA, Inc. ("LG USA").

2.     This Declaration is submitted in support of LG USA's *Daubert* Motion to Exclude Opinions and Testimony of Plaintiffs' Experts.

3.      Attached hereto as Exhibit A is a true and accurate copy of the Expert Report of

Dr. Chin S. Yang filed on February 22, 2003 in *Billescas v. Allstate Texas Lloyd,* No. 02-CV-00408

(S.D. Tex.), available at 2003 WL 25802448.

4.      Attached hereto as Exhibit B is a true and accurate copy of the Memorandum and

Order issued in *Sanchez v. Abbott Laboratories, Inc.*, No. H-03-1820 (S.D. Tex. Sept. 20, 2004).

I hereby declare under the penalty of perjury that the foregoing statements made by me are

true and correct.


                                    s/ Melissa Steedle Bogad
                                    Melissa Steedle Bogad

Dated:  May 13, 2011

2

GZJ KDKV C

Westlaw.

2003 WL 25802448 (S.D.Tex.)          Page 1

For Dockets See 7:02CV00408

United States District Court, S.D. Texas.
BILLESCAS,
v.
ALLSTATE TEXAS LLOYD.
No. 02CV00408.
February 22, 2003.

(Report or Affidavit of Chin S. Yang, Ph.D.)

**Name of Expert:** Chin S. Yang, Ph.D.
**Area of Expertise:** Engineering & Science >> Bio-chemist/Microbiologist
**Case Type:** N/A >> N/A
**Case Type:** Insurance >> Homeowners Policy
**Jurisdiction:** S.D.Tex.
**Representing:** Plaintiff

Mr. ?? A. Clark, CIH

PE Service Environmental Ltd.

Suite 117?? - 3730 Kirby Drive

Houston, Texas ??

Dear Mr. Clark:

My name is Chin S. Yang, Ph.D. I earned a Doctor of Philosophy degree from the Department of Forest and Environmental Biology, the State University of New York, College of Environmental Science and Forestry at Syracuse, New York in 1984. After receiving my Ph.D. degree. I was offered a Postdoctoral Fellowship in Mycology and worked at Cornell University, from 1984 to 1985. From 1985 to 1990, I was a Postdoctoral Research Associate, research scientist, and visiting scientist at the State University of New York. College of Environmental Science and Forestry. In addition, I had successfully completed a course in Medical Mi-crobiology at the State University of New York. Health Science Center in Syracuse, New York in 1989.

From 1990 to 1993, I was a contract consultant with the U.S. Public Health Service. Division of Federal Occupational Health Region III, and was a staff mi-crobiologist of the agency from 1993-1994. I have been the president of P&K Microbiology Services, Inc. since 1994.

Since the early 1980's, I have worked extensively with allergists, industrial hygienists, environmental pro-fessionals, occupational and environmental health physicians, and public health officials throughout the U.S. on the proper handling and dealing with fungal and bacterial contamination indoors. I am very fa-miliar with the literature in indoor fungal and bacterial contamination, as well as industry wide approaches on the assessment of fungal amplification and contami-nation in the indoor environment.

I have considered the questions posed by you regard-ing hidden mold and reviewed both versions of the New York City Department of Health (NYCDOH) Guidelines (1, 2), as well as the US EPA document "Mold Remediation in Schools and Commercial Buildings" (3). The specific website address to access the document is http://www.epa.gov/i??q/molds/toc.html. I was in-volved in the generation of the two NYCDOH guide-lines and served as a reviewer of the USEPA docu-ment. The microscopic photographs of fungi on the cover of and several photographs in the EPA docu-ment were provided by me. I am very familiar with the origin and evolution of these documents.

On May 7, 1993, the New York City Department of Health (NYCDOH), The New York City Human Re-sources Administration, and the Mt. Sinai Occupa-tional Health Clinic convened an expert panel on *Stachybotrys chartarum* (known as *S. ??* at that time) at the request of the Social Service Employee Union 371. My laboratory had analyzed many samples for the Union 371 and I was invited by the representative of the Union 371 to participate in the workshop dis-cussion. The first guidelines were issued by the NYCDOH in 1994 based on the discussion in the workshop. The guidelines was included and published in the "Proceeding of the International Conference on Fungi and Bacteria in Indoor Air Environments" in 1993 (1).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2003 WL 25802448 (S.D.Tex.)                                                                 Page 2

In 1998, the NYCDOH convened another expert panel to review and update the 1993 guidelines. Based on the inputs from over 20 international experts, a revised and expanded document titled "Guidelines on Assessment and Remediation of Fungi in Indoor Environments' was published in 2000 (2). The new guidelines include all fungi that grow indoors. The document is available by accessing the NYCDOH web site at *http://www.??/html/do??/html/??/moldrptl.html* or in printed copy by calling 212-786-4290.

The NYCDOH has jurisdiction covering the entire City of New York (whether schools, homes, commercial buildings, governmental buildings, etc.), and is an agency serving the general public as well as the public and private sectors. In the Executive Summary of the 2000 Guidelines, it is clearly stated that "It is intended for use by building engineers and management, but is available for general distribution to anyone concerned about fungal contamination, such as environmental consultants, health professionals, or the general public." It only makes sense that all citizens of the city have an interest in the issue because the primary concern of indoor fungal growth is human health. It is critically important to note that although the document is written in plain English, mis-interpretation, mis-understanding, or mis-use of the document is a common problem because very few individuals, building engineers and management, or environmental consultants and industrial hygienists have a fundamental understanding, background knowledge or training in mycology. The quality of a mold assessment depends on an individual's educational background, training, experience, and their understanding of available guidelines.

Indoor mold growth follows the track of water and moisture. They may grow on surfaces that are accessible and visible to building occupants. On the other hand, they can grow in wall cavities, inside the HVAC system, or in hidden spaces (such as crawl spaces). Some molds on surfaces may not be visible or discernible by untrained eyes or without the aid of a high-power microscope. I have had many cases where environmental professionals failed to detect mold growth on surfaces of occupied spaces with dark background or covered with vinyl wallpaper. Furthermore, hidden molds may penetrate through walls if moisture conditions are not addressed. Spores of hidden molds in the HVAC system can be liberated, aerosolized, and contaminating occupied spaces. The

NYC Guidelines, stating in the Executive Summary, focuses "mold contamination of building components (walls, ventilation systems, support beams, etc.) that are chronically moist or water damaged." Mold growth on walls, ventilation systems, support beams may or may not be visible. The document further recommends (in 2.1 Visual Inspection) to "use equipment such as boroscope, to view spaces in ductwork or behind walls, or a moisture meter, to detect moisture in building materials, may be *helpful* in identifying hidden sources of fungal growth and the extent of water damage." It is very clear that the document recommends that "hidden sources of fungal growth and the extent of water damage" be identified. The USEPA document dedicates a printed page (see below) on the issue of hidden mold. Although hidden mold may not be obvious, it is not harmless.

Hidden Mold

In some cases, indoor mold growth may not be obvious. It is possible that mold may be growing on hidden surfaces, such as the back side of dry wall, wallpaper, or paneling, the top of ceiling tiles, the underside of carpets and pads, etc. Possible locations of hidden mold ?? include pio?? and utility tunnels (with leaking or condensing pipes), walls behind furniture (where condensation forms), condensate drain pans inside air handling units, porous thermal or acoustic liners inside ductwork, or roof materials above ceiling tiles (due to roof leaks or insufficient insulation).

Some building materials, such as dry wall with vinyl wallpaper over it or ?? pan??ing, may act as vapor barriers (5) trapping moisture underneath their surfaces and thereby providing a moist environment where mold can grow. You may suspect hidden mold if a building smells moldy, but you cannot see the source, or if you know there has been water damage and building occupants are reporting health problems. Investigating hidden mold problems may be difficult and will require caution when the investigation involves disturbing potential sites of mold growth--make sure to use personal protective equipment (PPE). For example, removal of wallpaper can lead to a massive release of spores from mold growing on the underside of the paper. If you believe that you may have a hidden mold problem, you may want to consider hiring an experienced professional. If you discover hidden mold, you should revise your re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

mediation plan to account for the total area affected by mold growth.

Some molds are darkly pigmented (dematiaceous) and can become visible if they grow to a certain density and size. However, many molds and spores are hyaline to lightly pigmented (such as most species of *Aspergillus, Penicillium,* and *Acremonium,* to name a few) and are not very visible to the naked eye. Background color can also mask or interfere with the visibility of mold growth on surfaces. Mold growth can produce abundant spore masses for dispersal and dissemination. The spores can be easily aerosolized and traveled with air stream and movement. Some of the spores will settle on and contaminate indoor surfaces as well as the HVAC system. Because of the small spore sizes (mostly 2-10 ??m; 1 ??m = 0.000039 inch), fungal spores on surfaces and contamination are not visible to the naked eye without the aid of a high-power magnifying microscope or testing. Only proper sampling by a competent consultant, testing performed by a reputable and credible mycologist, as well as expert comparison and interpretation can determine whether interior surfaces are contaminated by fungal spores or not.

To detect hidden mold in wall cavities, various equipment (such as a boroscope) and sampling devices (such as wall-check cassettes) have been used or mis-used by consultants. A boroscope has very limited magnifying power and resolution. In addition, poor lighting, reduced depth of view, and insulation materials inside a wall cavity can all limit the effectiveness of a boroscope. The use of a boroscope is no different from visual inspection of mold growth. Positive visual inspection plus confirmation testing can determine mold growth. However, no visible mold growth by visual inspection and/or by boroscope inspection is inconclusive at best and does not conclude the absence of mold growth.

In summary, the NYCDOH guidelines are intended for use by building engineers and management (because they have the primary responsibility dealing with water damage and mold growth), but are available for general distribution to anyone concerned about fungal contamination, such as environmental consultants, health professionals, or the general public. The 2000 version states that visible mold must be dealt with and does not specifically state that no visible mold is a positive confirmation of a mold-free envi-

ronment. Inspection and assessment of indoor mold growth include all surfaces, particularly where water damage has occurred, visible or hidden. This may include wall cavities, the HVAC system, support beams, etc. The USEPA document also agrees with the assessment. All surfaces, systems, and personal belongings in a mold environment or building are considered contaminated because the aerosolization, dispersal and settlement of fungal spores. The spore contaminants are not visible by the naked eye and should be confirmed by testing. A boroscope can be used to search for hidden mold. However, the boroscope has *very limited* capacity. No visible mold growth with the boroscope inspection is *not* a proof of a mold-free environment.

References:

1. Johanning, E. and C. S. Yang. 1995. Fungi and Bacteria in Indoor Air Environments. Health Effects, Detection and Remediation, the Proceeding of the International Conference on Fungi and Bacteria in Indoor Air Environments, October 6-7, 1994. Eastern New York Occupational Health Program, Latham, New York.

2. New York City Department of Health. 2000. Guidelines on Assessment and Remediation of Fungi in Indoor Environments. 14 pp. (*www.ci.??.ny.us/html/??/ html/epi/moldrptl.html*)

3. United States Environmental Protection Agency. 2001. Mold Remediation in Schools and Commercial Buildings, EPA 402-K-01-001. 48 pp. (http:// www.epa.gov/iag/molds/toc html)

I hope that this letter answers and clarifies your questions. If you have additional questions regarding this report, please call this office at 856-489-4455.

END OF DOCUMENT

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

SEP 2 0 2004

Michael N. Milby, Clerk of Court

RICHARD SANCHEZ, *et al.,* §
§
Plaintiffs, §
§
v. § CIVIL ACTION NO. H-03-1820
§
ABBOTT LABORATORIES, INC., *et al.,* §
§
Defendants. §

## MEMORANDUM AND ORDER

Pending before the Court are several motions filed by Defendants Abbott Laboratories, Inc. ("Abbott"), Medline Industries, Inc. ("Medline"), United Parcel Service, Inc. ("UPS"), and Texas Children's Home Health Services, Inc. ("Texas Children's") (collectively, "Defendants"), including motions for summary judgment,[1] motions to exclude the expert testimony of Dr. Chin S. Yang, Ph.D. ("Dr. Yang"),[2] and motions to strike the affidavit of

---

[1]     UPS' Motion for Judgment on the Pleadings or, in the alternative, Motion for Summary Judgment ("UPS MSJ-1") [Doc. # 24]; Abbott's Motion for Summary Judgment ("Abbott MSJ") [Doc. # 47]; Medline's Joinder in Abbott's Motion for Summary Judgment [Doc. # 48]; Texas Children's Motion for Summary Judgment ("Texas Children's MSJ) [Doc. # 49]; UPS' Supplement to its Motion for Judgment on the Pleadings or, in the alternative, Motion for Summary Judgment ("UPS Supp. to MSJ-1")[Doc. # 51]; UPS' Motion for Summary Judgment ("UPS MSJ-2") [Doc. # 52].

[2]     Defendants' Joint Motion to Exclude Testimony of Plaintiffs' Expert, Dr. Yang ("Defendants' Joint Motion to Exclude") [Doc. # 50].

Dr. G. S. Gopalakrishna, M.D. ("Dr. Gopalakrishna").[3]  The parties have responded[4] and replied[5] to the pending motions.  After reviewing the parties' submissions, the record, and the applicable authorities, the Court determines that Defendants' motions for summary judgment [Docs. ## 24, 47, 48, 49, 52], motions to exclude the expert testimony of Dr. Yang [Doc. # 50], and motions to strike the affidavit of Dr. Gopalakrishna [Docs. ## 63, 65, 67] should be granted.  The Court further determines that the claims of Plaintiff Richard Sanchez

---

[3]    Texas Children's Motion to Strike Affidavit of Dr. Gopalakrishna ("Texas Children's Motion to Strike") [Doc. # 63]; Abbott's Motion to Strike Affidavit of Dr. Gopalakrishna ("Abbott's Motion to Strike") [Doc. # 65]; Medline's Joinder in Support of Abbott's Motion to Strike Affidavit of Dr. Gopalakrishna [Doc. # 67].

[4]    Plaintiffs' Response to UPS' MSJ-1 [Doc. # 28]; Plaintiffs' Response to Defendants' MSJ [Doc. # 60]; Plaintiffs' Opposition to Texas Children's and Abbott's Motion to Strike the Affidavit of Dr. Gopalakrishna ("Plaintiffs' Response to Defendants' Motion to Strike") [Doc. # 69]; Plaintiffs' Response to Defendants' Joint Motion to Exclude Testimony of Plaintiffs' Expert, Dr. Yang ("Plaintiffs' Response to Defendants' Joint Motion to Exclude") [Doc. # 70]; Plaintiffs' Supplemental Response to Defendants' Joint Motion to Exclude Testimony of Plaintiffs' Expert, Dr. Yang ("Plaintiffs' Supp. Response to Defendants' Joint Motion to Exclude") [Doc. # 76].

[5]    UPS' Reply to Plaintiffs' Response to UPS' MSJ-1 ("UPS Reply to UPS MSJ-1") [Doc. # 30]; Texas Children's Reply in Support of its MSJ ("Texas Children's Reply to MSJ") [Doc. # 62]; Abbott's Reply to Plaintiffs' Response to its MSJ ("Abbott's Reply to MSJ") [Doc. # 64]; UPS' Reply to Plaintiffs' Response to its MSJ-2 ("UPS Reply to UPS MSJ-2) [Doc. # 66]; Defendants' Reply to Plaintiff's Response to Defendants' Motion to Strike Affidavit of Dr. Gopalakrishna ("Defendants' Reply to Defendants' Motion to Strike") [Doc. # 72]; UPS' Reply to Plaintiffs' Response to Defendants' Joint Motion to Exclude Testimony of Plaintiffs' Expert, Dr. Yang ("UPS Reply to Defendants' Joint Motion to Exclude") [Doc. # 74]; Texas Children's Reply to Plaintiffs' Response to Defendants' Joint Motion to Exclude Testimony of Plaintiffs' Expert, Dr. Yang ("Texas Children's Reply to Defendants' Joint Motion to Exclude") [Doc. # 75]; Defendants' Reply to Plaintiffs' Supplemental Response to Defendants' Joint Motion to Exclude Testimony of Plaintiffs' Expert, Dr. Yang ("Defendants' Supp. Reply to Defendants' Joint Motion to Exclude") [Doc. # 77].

("Sanchez"), individually, and Richard Sanchez, as next friend of A.S. (collectively, "Plaintiffs") must be dismissed.

## I.  **BACKGROUND FACTS**

This is a personal injury case in which Plaintiffs claim that A.S., a minor, suffered injuries from the consumption of PediaSure.[6]  A.S., who was born in 1994, suffers from cerebral palsy.  He is developmentally delayed with the mental capacity of a one- or two-year old.  He is unable to speak, feed, or care for himself and consumes food supplements (*e.g.*, PediaSure) through a Gastronomic G-Button or G-Tube connected to his stomach.[7]  A.S. is the son of Richard Sanchez.

Plaintiffs allege that on or about September 2001, they ordered from Texas Children's eight cases of PediaSure, as a food supplement for A.S.  PediaSure is manufactured by Abbott.[8]  According to Plaintiffs, the PediaSure was shipped, stored and/or delivered by Medline through UPS.[9]  Plaintiffs maintain that "the PediaSure shipment [was] contaminated" with a "harmful mold-like substance," resulting from either the manufacturing, storage, or shipping stages.[10]  Plaintiffs assert that some of this PediaSure was ingested by A.S. (who then

---

[6]      Plaintiffs' Amended Complaint, ¶ 7 [Doc. # 12].

[7]      Deposition of Richard Sanchez, Feb. 10, 2004 ("Sanchez Depo."), Exh. A to UPS MSJ-2, at 22-23, 31, 35; Plaintiffs' Response to UPS MSJ-1, at 4-5.

[8]      Plaintiffs' Amended Complaint, ¶ 7.

[9]      *Id.*

[10]      *Id.*

was approximately six or seven years old) and caused him damages, "severe physical sicknesses," and a lengthy setback in his physical and emotional development.[11]

On April 11, 2003, Plaintiffs filed their Original Petition against Abbott, Medline, and UPS, in the 55th Judicial District Court of Harris County, Texas.[12]  UPS removed the case on May 27, 2003, asserting federal question and diversity jurisdiction under 28 U.S.C. §§ 1331, 1332, 1337.[13]  On July 30, 2003, the Court granted Plaintiffs' Motion for Leave to Amend their Complaint, allowing the addition of Texas Children's as a defendant.[14]  In their Amended Complaint, Plaintiffs assert against Abbott a claim of strict products liability, contending that Abbott sold PediaSure in a "defective condition [that was] unreasonably dangerous."[15] Plaintiffs further assert against UPS, Medline, Abbott, and Texas Children's a claim for negligence.[16]

## II.   **SUMMARY JUDGMENT STANDARD**

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on

---

[11]   *See id.*

[12]   Plaintiffs' Original Petition, Exh. A.2 to UPS' Notice of Removal [Doc. #1].

[13]   *See* UPS' Notice of Removal, ¶¶ 10-26.

[14]   Order granting Plaintiffs' Unopposed Motion for Leave to Amend Complaint [Doc. # 14].

[15]   Plaintiffs' Amended Complaint, ¶ 8.

[16]   *Id.*, ¶ 9.

which that party will bear the burden of proof at trial. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322-23; *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002). An issue is material if its resolution could affect the outcome of the action. *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). In deciding whether a fact issue has been created, the facts and the inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Hotard v. State Farm Fire & Cas. Co.,* 286 F.3d 814, 817 (5th Cir. 2002). However, factual controversies are resolved in favor of the nonmovant "only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998). The movant

meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Id.* If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)). A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* (quoting *Smith*, 158 F.3d at 911); *see also Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Morris v. Covan Worldwide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *see also Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that "unsworn pleadings do not constitute proper summary judgment evidence"). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Morris*, 144 F.3d at 380. Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (5th Cir. 1995); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

## III.   <u>ANALYSIS</u>

In their Amended Complaint, Plaintiffs assert against Abbott a claim of strict products liability, contending that Abbott sold PediaSure in a "defective condition."[17] Plaintiffs further assert against UPS, Medline, Abbott, and Texas Children's a claim for negligence.[18]

### A.   <u>Subject Matter Jurisdiction</u>

In response to summary judgment motions, Plaintiffs argue that this case should be remanded back to state court, alleging that there is no subject matter jurisdiction and there is no diversity jurisdiction between Plaintiffs and Defendant Texas Children's.[19]   Defendants contend that this assertion is both incorrect and untimely.[20]   This Court agrees.[21]

Contrary to Plaintiffs' contention, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which give this Court original jurisdiction over all civil actions arising under the Constitution, law, or treaties of the United States.   UPS contends that Plaintiffs' claims fall under various federal statutes and federal common law, as discussed in the next

---

[17]   Plaintiffs' Amended Complaint, ¶ 8.

[18]   *Id.*, ¶ 9.

[19]   Plaintiffs' Response to Defendants' MSJ, at 5.

[20]   *See* UPS Reply to MSJ-2, at 1-4; Texas Children's Reply to MSJ, at 2-3; Abbott Reply to MSJ, at 6-8.

[21]   It does not go unnoticed by the Court that Plaintiffs' current position is contrary to that taken by Plaintiffs when they sought leave of court to amend their complaint to add Texas Children's as a defendant in July 2003.   *See* Plaintiff's Unopposed Motion for Leave to Amend Complaint [Doc. # 11].   In their motion for leave, Plaintiffs argued that, although the addition of a non-diverse party would destroy diversity jurisdiction, "[t]his Court would retain jurisdiction under both 28 U.S.C. § 1331 and 28 U.S.C. § 1337." *Id.*, ¶¶ 7, 11.

section.  Additionally, this Court has original jurisdiction over this matter under 28 U.S.C. § 1337(a), as this case involves a matter relating to the regulation or protection of trade and commerce, exceeds $10,000 exclusive of interest and costs, and involves the application of the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706.  *See New Process Steel Corp. v. Union Pac. R.R. Co.*, 91 Fed. Appx. 895, 897-98, No. 02-20827, 2003 WL 22533559, at *3 (5th Cir. Nov. 10, 2003) (removal proper as plaintiff's state tort claims necessarily "arise under federal law"); *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 775-78 (5th Cir. 2003) (removal proper because Carmack Amendment provides the exclusive cause of action for claims stemming from loss or damages to goods arising from interstate transportation of those goods by a common carrier).

## B.   Negligence

Plaintiffs assert against all Defendants a state law claim for negligence.[22]

### 1.   Preemption

UPS argues that Plaintiffs' state law negligence claim is preempted by:  (1) the Carmack Amendment to the Interstate Commerce Act ("Carmack Amendment"), 49 U.S.C. § 14706, and/or federal common law; and (2) the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. §§ 14501(c)(1) and Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713(b)(4).[23]

---

[22]   Plaintiffs' Amended Complaint, ¶ 9.

[23]   UPS MSJ-1, at 5-12; UPS Reply to UPS MSJ-1, at 3-11; UPS Supp. to UPS MSJ-1, at 2-5.

a.      **Carmack Amendment and/or Federal Common Law**

i.      **General Principles**

It is well settled that the liability of a carrier for damage to an interstate shipment is controlled by the Interstate Commerce Act ("ICA"). *See Missouri Pac. R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964).  The Carmack Amendment to the ICA, the first comprehensive statute governing ground transportation by common carriers, provides that federal law controls liability for goods lost or damaged during interstate shipments. *See* 49 U.S.C. § 14706(a)(1); *see also Elmore & Stahl*, 377 U.S. at 137-38; *Sam L. Majors Jewelers v. ABX, Inc.,* 117 F.3d 922, 926 (5th Cir. 1997); *Frosty Land Foods Int'l, Inc. v. Refrigerated Transp. Co.*, 613 F.2d 1344, 1346 (5th Cir. 1980).

The Supreme Court has declared that through the Carmack Amendment to the ICA, Congress totally preempted state regulation of the liability of common carriers. *See Adams Exp. Co. v. Croninger,* 226 U.S. 491, 505 (1913).  The Supreme Court has further found that "national law is paramount and supersedes all state laws as to the rights and liabilities" of carriers. *See id*.  The Fifth Circuit also has determined that for "actions seeking damages for the loss of property shipped in interstate commerce by a common carrier under a receipt or bill of lading, the Carmack Amendment is the shipper's sole remedy." *Morris,* 144 F.3d at 382; *see Hoskins*, 343 F.3d at 778; *Moffit v. Bekins Van Lines Co.*, 6 F.3d 305, 306-07 (5th Cir. 1993); *see also New Process Steel Corp.*, 91 Fed. Appx. at 897-98, No. 02-20827, 2003 WL 22533559, at *3.

Similarly, federal common law regulating air carriers follows the policies and principles of the Carmack Amendment and preempts the application of state law to interstate air carriers. *See, e.g., Vogelsang v. Delta Airlines, Inc.*, 302 F.2d 709, 712 (2d Cir.), *cert. denied*, 371 U.S. 826 (1962) (relying on Carmack Amendment principles in upholding air carrier's limitation of liability). Because Congress has created a "broad, comprehensive scheme covering the interstate shipment of freight," the liability of an interstate air carrier for claims arising from damage to a package shipped through that carrier are governed exclusively by federal common law an that state claims are preempted. *See Sam L. Majors Jewelers*, 117 F.3d at 923-29; *see also Read-Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1193-95 (9th Cir. 1999); *North Am. Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229, 233-34 (2d Cir. 1978). Thus, a plaintiff's sole remedy for alleged loss or damage arising from the shipment of good by an interstate air carrier is a claim under federal common law. *See Nippon Fire & Marine Ins. Co. v. Skyway Freight Sys., Inc.*, 235 F.3d 53, 58-60 (2d Cir. 2000) (precluding plaintiff from asserting tort claim against carrier); *Sam L Majors Jewelers*, 117 F.3d at 929-30 (applying federal law); *Deiro v. American Airlines, Inc.*, 816 F.2d 1360, 1365 (9th Cir. 1987) (applying federal common law). Although Plaintiffs do not mention the Carmack Amendment in their Amended Complaint, the Court concludes that the Carmack Amendment applies because Plaintiffs make the following allegations: "The shipment of PEDIASURE was shipped, stored, and/or delivered by Co-Defendant, MEDLINE INDUSTRIES, INC., through Co-Defendant UNITED PARCEL SERVICE, INC. The

containers and boxes of the PEDIASURE shipment were contaminated with a harmful mold-like substance, resulting from the manufacturing, product storage, and/or shipping stages."[24] Sanchez admitted in his deposition that the only complaint he has against UPS is the manner in which UPS transported and delivered the PediaSure to his home.[25]

---

[24]   Plaintiffs' Amended Complaint, ¶ 7.

[25]   Sanchez testified:

> Q.   Okay.  And why -- why were y'all calling UPS?  What was the reason for the call?
>
> A:   I think we were upset with them just leaving things at our front door without knocking on the door and in the -- and in the fashion that they leave the, you know, things at the door, tossed, you know, not stacked, just thrown on the porch.
>
> \* \* \* \*
>
> Q:   Other than those two reasons you just gave me, are there any other reasons you were upset with UPS?
>
> A:   Basically I feel the way that the product's being delivered to the house at the very end of the day and this Pediasure riding on the back of the truck all day long in all of this heat, you know, raises the liquid content to a certain level that it raises bacteria in it.
>           I can't prove it.  I'm not -- I'm not a scientist or anything like that, but I know that it says on the packaging to keep from extreme heat.
>
> \* \* \* \*
>
> Q:   Is it fair to say that -- to summarize your complaints, that you basically don't like the manner in which the Pediasure is delivered to your home?
>
> A:   That's -- yes.  The manner and the procedure, the handling of the product.

(continued...)

Consequently, Plaintiffs' claims clearly relate to the delivery of goods, and thus the Carmack Amendment is applicable. *See New Process Steel Corp.*, 91 Fed. Appx. 897-98, No. 02-20827, 2003 WL 22533559, at *3 (concluding plaintiff's state tort claims for negligence and negligent misrepresentation constitute claims for "loss or damages to goods arising from the interstate transportation of those goods by a common carrier" and fall squarely within the scope of the Carmack Amendment); *Nichols v. Mayflower Transit, L.L.C.*, No. CVS 030273JCM(RJJ), 2003 WL 21981994, at *5 (D. Nev. June 19, 2003) (finding that plaintiffs "who made no mention of the Carmack Amendment in their Amended Complaint" stated a cause of action under the Carmack Amendment); *Newens v. Orna Servs., Inc.*, No. C 02-01570CRB, 2002 WL 1310734, at *2 (N.D. Cal. June 10, 2002) (treating the plaintiff's first cause of action as a Carmack Amendment claim despite the fact that the Carmack Amendment was not explicitly referenced).  As such, Plaintiffs' negligence claims against UPS fall squarely within the scope of the Carmack Amendment preemption because it "embraces 'all losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation . . . .'" *Smith v. United Parcel Serv., Inc.*, 296 F.3d 1244, 1247 (11th Cir. 2002), *cert. denied*, 537 U.S. 1172 (2003) (quoting *Georgia, Fla. & Ala. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 196 (1916)).

---

[25]      (...continued)

Sanchez Depo., Exh. A to Defendants' Joint Motion to Exclude, at 158, 160-61; *see also* UPS Supp. to UPS MSJ-1, at 3-4.

In the case at bar, Plaintiffs assert that their state law negligence claim against UPS is not preempted by the Carmack Amendment because the statute only applies to property damage, not personal injuries.[26] Plaintiffs also argue that their claims are separate and distinct from UPS's contract of carriage to deliver goods so that the Carmack Amendment's savings clause[27] excludes their claims from its preemptive effect.[28] In reply, UPS asserts that Plaintiffs' injuries are inseparable from the damage to the package—*i.e.*, the alleged damage to the package (mold) was the cause of Plaintiffs' injuries.[29] UPS contends that because Plaintiffs' injuries flow directly from the alleged damage to the package, the Carmack Amendment preempts Plaintiffs' claim.[30]

The case before this Court is factually similar to *Tayloe v. Kachina Moving & Storage, Inc.*, 16 F. Supp. 2d 1123 (D. Ariz. 1998), a case in which the court considered whether special damages for personal injury could be recovered under a Carmack claim. In *Tayloe*, the plaintiffs alleged that, during defendant's movement and storage of their household belongings, some of their property was lost and damaged and that the mold damage to some of their property caused plaintiff to have a severe allergic reaction, requiring two

---

[26]    Plaintiffs' Response to UPS MSJ-1, at 2, 7-15.

[27]    The savings clause states: "Except as otherwise provided in this part, the remedies provided under this part are in addition to remedies existing under another law or common law." 49 U.S.C. § 13103.

[28]    Plaintiffs' Response to UPS MSJ-1, at 2, 7-15.

[29]    UPS Reply to UPS MSJ-1, at 2-9.

[30]    *Id.*

hospitalizations. *See id*. at 1126. Plaintiffs brought four claims against defendant, namely a Carmack Amendment claim, a breach of contract claim,[31] a breach of implied duty to perform work in a skillful and workmanlike manner claim, and a negligence claim. The district court extended Carmack Amendment preemption to plaintiffs' claims for personal injuries suffered as the result of changes made to shipped goods through negligence of the carrier and injuries resulting therefrom to the shipper.[32] *Id*. at 1128; *see also Strike v. Atlas Van Lines, Inc.*, 102 F. Supp. 2d 599, 600 (M.D. Pa. 2000) (Carmack preemption extends to claims involving personal injuries resulting from reaction to gasoline negligently spilled on shipped goods). Here, as in *Tayloe*, Plaintiffs' injuries arose as a result of the alleged development of mold on their package during the shipping process. Plaintiffs' sole allegation against UPS is that it negligently caused damage to their package during shipment. Plaintiffs have not alleged that UPS took any action that caused them injury other than delivering the shipment at issue.[33] Plaintiffs' attempt to narrow the scope of Carmack Amendment fails.

---

[31]   In *Tayloe*, the plaintiffs' goods were shipped through a contract arranged by plaintiff's employer. Plaintiffs, as consignees, were bound by the terms of the shipping contract between the shipper and the carrier. *See Tayloe*, 16 F. Supp. 2d at 1130 n.6.

[32]   The district court, however, noted that the plaintiff may be able to recover special damages under her Carmack Amendment claim because of her allegation that she informed defendant of her allergies and requested that defendant store her goods in a dry atmosphere. *See Tayloe*, 16 F. Supp. 2d at 1129.

[33]   UPS notes for purposes of its reply that it was involved in the delivery as alleged by Plaintiffs, although Plaintiffs have provided no evidence to that effect and UPS has no record that it was involved in making a delivery to Plaintiffs. *See UPS Reply to UPS MSJ-1, at 8 n.2.

### ii.    Standing

UPS further argues that even if Plaintiffs had asserted a claim under the Carmack Amendment or federal common law, Plaintiffs lack standing to assert such a claim and it should be dismissed.[34]  Plaintiffs' arguments to the contrary are futile.

The Carmack Amendment provides that a carrier's liability is limited to the "person entitled to recover under the receipt or bill of lading."  49 U.S.C. § 14706(a)(1).  Thus, the only proper plaintiff in a suit against a carrier for damages arising from a shipment is the lawful holder of the shipment receipt for the package.  *See Pennsylvania R.R. Co. v. Olivit Bros.*, 243 U.S. 574, 583 (1917); *see generally Neal v. Republic Airlines, Inc.*, 605 F. Supp. 1145, 1150 (N.D. Ill. 1985); *McDowell Assocs., Inc. v. Pennsylvania R.R.*, 151 F. Supp. 894, 897 (S.D.N.Y. 1957).

Here, Plaintiffs concede that they were not under a contract of carriage with UPS.[35]  The shipper of the PediaSure was Medline.  The contract at issue was between Medline and UPS.  Plaintiffs did not contract with UPS regarding the PediaSure shipment.  Consequently, Plaintiffs do not have standing to assert a claim against UPS under the Carmack Amendment or federal common law, and are not entitled to recover under the receipt or bill of lading.

### iii.    Savings Clause

Plaintiffs' reliance on the savings clause in the Carmack Amendment is misplaced.  Courts interpreting this clause have found that the Carmack Amendment does not preempt

---

[34]    UPS MSJ-1, at 12-13.

[35]    Plaintiffs' Response to UPS MSJ-1, at 3, 16-18.

those state law claims that allege liability on a ground that is separate and distinct from the loss of, or the damage to, the goods that were shipped in interstate commerce. However, Plaintiffs at bar have not alleged against UPS conduct separate and distinct from UPS's alleged negligence in the delivery of the PediaSure. *See Morris*, 144 F.3d at 382 (acknowledging that the Carmack Amendment would not preempt claims "separate and apart from those resulting directly from the loss of shipped property," but holding that the Carmack Amendment preempted claims seeking damages for intentional infliction of emotional distress as well as punitive damages as a result of egregious conduct by a carrier in the course of discharging its duties); *see also Gordon v. United States Van Lines, Inc.*, 130 F.3d 282, 289 (7th Cir. 1997) (citations omitted). To the contrary, Plaintiffs' injuries are not separate and distinct, but are consequential damages arising from the alleged damage to property shipped in interstate commerce. *See Smith*, 296 F.3d at 1246-49 (rejecting plaintiffs' savings clause argument because plaintiffs' claims clearly related to the delivery of the goods); *Moffit*, 6 F.3d at 305-07 (holding Carmack Amendment preempted state law claims based on carrier's late delivery despite the absence of any loss or damage).[36]

Thus, like in *Smith* and *Tayloe*, Plaintiffs' state law negligence claims, which seek damages arising from an interstate shipment (whether it be *via* ground or air service), are

---

[36]   The cases cited by Plaintiffs do not support Plaintiffs' contention that their injuries are separate and distinct, as they do not relate to damages that arose from the actions of the carrier during the shipment process. *See* Plaintiffs' Response to UPS MSJ-1, at 14-16.

preempted by the Carmack Amendment and federal common law.[37] *See Smith*, 296 F.3d at 1249; *Tayloe*, 16 F. Supp. 2d at 1127.

### iv.    *Prima Facie* Case

In a suit to recover damages for loss of goods in transit under the Carmack Amendment, the shipper establishes a *prima facie* case by proving three elements: (1) delivery of the goods to the carrier in good condition; (2) arrival of the goods at their destination in damaged condition; and (3) the amount of damages. *See Accura Sys., Inc. v. Watkins Motor Lines, Inc.*, 98 F.3d 874, 877 (5th Cir. 1996). "Thereupon, the burden of proof is upon the carrier to show both that is was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." *Elmore & Stahl*, 377 U.S. at 138 (citations omitted); *accord Johnson & Johnson v. Chief Freight Lines Co.*, 679 F.2d 421, 422 (5th Cir. 1982); *Frosty Land Foods Int'l, Inc.*, 613 F.2d at 1346-47. Hence, issues such as the "origin of shipment, place or cause of damage, and whether it is due to fault of the carrier or shipper . . . are actually defensive matters," not elements of the claim. *See Thompson v. James G. McCarrick Co.*, 205 F.2d 897, 900-01 (5th Cir. 1953).

In the case at bar, Plaintiffs do not allege or produce evidence that the PediaSure was delivered by Medline to UPS in a good and uncontaminated state. Thus, Plaintiffs have failed to establish an essential element of their *prima facie* claim against UPS.

---

[37]     With respect to both the Carmack Amendment and federal common law, the only claim Plaintiffs could have asserted would have been a claim for breach of the shipping contract; Plaintiffs, however, have failed to assert such a claim, presumably because they were not parties to that contract, which was between Medline and UPS.

### b.    FAAAA

In 1994, Congress enacted the FAAAA to deregulate the motor carrier industry. *See* 49 U.S.C. § 14501(c)(1); *see also Stucky v. City of San Antonio*, 260 F.3d 424, 428 (5th Cir. 2001), *vacated on other grounds*, 536 U.S. 936 (2002). "Section 601 of the FAAA[A] amended the [ICA], preempting state and local regulations concerning the price, route, or service of intrastate motor carriers."[38] *See id.* at 428 & n.4.

In a case factually similar to that at bar, a Massachusetts District Court determined that the contamination of a package during the shipping process falls within the scope of FAAAA preemption. *See Soly v. United Parcel Serv., Inc.*, No. 02-CV-10499-MEL, 2002 LEXIS 24059, at *3-4 (D. Mass. Aug. 22, 2002). In *Soly*, the plaintiff filed suit seeking damages for injuries that occurred as a result of exposure to a package allegedly contaminated with anthrax. Plaintiff complained that the package should not have been delivered to him in a contaminated condition. In examining the case, the court found that the plaintiff's claims were preempted under the FAAAA because the complaint related to the manner in which the defendant provided its *service* of delivering packages. The court determined that such a claim is preempted b the FAAAA as it goes to "the heart of the 'services' that [defendant] provides." *Id.* at *2. Thus, the court concluded that under the FAAAA, any claim relating to the manner in which the defendant delivers packages is preempted.[39] *See id.*

---

[38]    A "motor carrier" is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(12).

[39]    Moreover, in *Soly*, the court found that even if the FAAAA did not apply, the claim would
(continued...)

Here, as in *Soly*, Plaintiffs seek to hold a carrier, UPS, liable for the service-related conduct of its employees – *i.e.*, the manner in which UPS shipped the package. Indeed, Plaintiffs only assert that UPS was negligent in the service it rendered, specifically the carriage and delivery of Plaintiffs' shipment of PediaSure.[40] Because Plaintiffs' negligence claim is essentially a request that state law be applied to regulate the manner in which UPS performs its services, it is preempted by the FAAAA.[41]

### 2.   Elements of Negligence

Plaintiffs assert claims of negligence against all Defendants. Irrespective of preemption by the Carmack Amendment of this claim as against UPS, Plaintiffs have failed to establish as to all Defendants essential elements of a negligence claim. Under Texas law, a negligence claim consists of four essential elements: (1) a legal duty owed to the plaintiff by the defendant; (2) a breach of that duty; (3) an actual injury to the plaintiff; and (4) a showing that the breach was the proximate cause of the injury. *See Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 830 (5th Cir. 2000); *Gutierrez v. Excel Corp.*, 106 F.3d 683, 687 (5th Cir. 1997); *Mellon Mortgage Co. v. Holder*, 5 S.W.3d 654, 663 (Tex. 1999); *Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex. 1999); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d

---

[39]   (...continued)
    still be preempted under the Carmack Amendment as the Carmack Amendment "governs the entire field of carrier liability." *Soly*, No. 02-CV-10499-MEL, 2002 LEXIS 24059, at *2.

[40]   Sanchez Depo., Exh. A to Defendants' Joint Motion to Exclude, at 158-61; UPS Supp. to UPS MSJ-1, at 3-4.

[41]   In their response, Plaintiffs fail to address the FAAAA preemption argument raised by UPS.

472, 477 (Tex. 1995); *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

### a.    Duty/Breach of Duty

A key inquiry in all negligence cases is whether the defendant owed a duty to the plaintiff. *See Ford*, 230 F.3d at 830; *Rodriguez v. Sabatino*, 120 F.3d 589, 591-92 (5th Cir. 1997), *cert. denied*, 523 U.S. 1072 (1998); *Holder*, 5 S.W.3d at 663. "Whether a legal duty exists is a threshold question of law for the court to decide from the facts surrounding the occurrence in question." *Thapar*, 994 S.W.2d at 637; *see Ford*, 230 F.3d at 830; *Phillips*, 801 S.W.2d at 525. If the defendant owed no duty, he cannot be found liable for negligence. *See Thapar*, 994 S.W.2d at 637; *San Benito Bank & Trust Co. v. Landair Travels*, 31 S.W.3d 312, 317 (Tex. App.—Corpus Christi 2000, no pet.). "A duty is a legally enforceable obligation to conform to a particular standard of conduct." *Id.*; *accord Rodriguez v. Moerbe*, 963 S.W.2d 808, 816 (Tex. App.—San Antonio 1998, pet. denied).

In assessing the existence of a duty, the court considers several interrelated factors, including the risk, foreseeability, and likelihood of injury, which must be weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant. *See Edward D. Jones & Co. v. Fletcher*, 975 S.W.2d 539, 544 (Tex. 1998); *Allen v. Albright*, 43 S.W.3d 643, 646 (Tex. App.—Texarkana 2001, no pet.). Of these factors, foreseeability of the risk is the dominant consideration. *See El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987); *Allen*, 43 S.W.3d at 646.

### i.    Texas Children's

Texas Children's maintains that it breached no duty it owed to Plaintiffs.  Plaintiffs contend that Texas Children's owed to them a duty "to ensure that the PediaSure was safe for consumption and free from fungi, mold, and bacteria."[42]  The Court concludes that, as a matter of law, Texas Children's did not owe a duty to Plaintiffs to inspect the PediaSure.[43]  Sanchez acknowledged that Texas Children's did not ship or store the PediaSure he ordered.[44]

Texas Children's acknowledges that it had a duty to exercise reasonable care to pass Plaintiffs' order through to Medline in this case.[45]  However, Texas Children's contends that Plaintiffs cannot establish that it breached that duty.  The Court agrees.  Sanchez admits that

---

[42]    Sanchez's Response to Texas Children's Interrogatories, Exhs. F & G to Texas Children's MSJ, at Interrogatory Nos. 17, 24.

[43]    Texas Children's MSJ, at 10-11.

[44]    Sanchez stated:

> Q:    . . . Do you believe that any of the eight cases of Pediasure at issue in this case was shipped from TCHH?
>
> A:    No, I don't believe that they were shipped directly from TCHH.  They came from Medline.
>
> Q:    Do you think that TCHH ever stored any of those eight cases at their location?
>
> A:    No, they did not.

Sanchez Depo., Exh. D to Texas Children's MSJ, at 207.

[45]    Texas Children's MSJ, at 10-11.

Texas Children's passed his order through to Medline without incident.[46]  Sanchez went on

to testify that he has never had a complaint about Texas Children's processing of his orders

to Medline.[47]   Considering Sanchez's testimony, the Court concludes that Plaintiffs have

failed to establish a question of fact that Texas Children's failed to exercise reasonable care

in passing Plaintiffs' order through to Medline.

_____

[46]      Sanchez testified:

> Q:      When you place an order with TCHH for Pediasure, do you typically
> specify what you want and how much of it you want?
>
> A:      Basic -- that's correct.
>
> Q:      . . . So, you would call and order five cases with fiber and three cases
> of regular?
>
> A:      Uh-huh.
>
> Q:      I'm sorry, sir.  Is that a "yes"?
>
> A:      Yes.
>
> Q:      Thank you.  In this particular instance did you receive the product and
> quantity that you ordered?
>
> A:      Yes.

Sanchez Depo., Exh. D to Texas Children's MSJ, at 52-53.

[47]      Sanchez testified:

> Q:      Would it be fair to say that you've never had any complaints about
> [Texas Children's] getting the process of your orders rolling?
>
> A:      I do not have any complaints with TCH.

*Id.* at 209.

Plaintiffs last gasp of a negligence claim against Texas Children's is that the hospital owed Plaintiffs a duty to provide its patients with appropriate and usable medical equipment and a duty to use reasonable care in formulating policies that govern its medical staff and nonphysician personnel.[48]   Plaintiffs, however, have failed to actually alleged in their Complaint that Texas Children's is a hospital, that it failed to use reasonable care in formulating its policies and procedures that govern its employees, or that its use of hospital equipment was negligent.[49] In any event, Plaintiffs fail to allege or produce any facts to demonstrate that Texas Children's policies regarding its medical staff and nonphysician personnel had anything to do with the injury to A.S. from allegedly contaminated PediaSure or otherwise.  Plaintiffs cite no legal authority to support a theory that Texas Children's owed Plaintiffs a duty to ensure that the PediaSure delivered to them was safe for consumption. Further, Plaintiffs concede that they do not assert a strict liability claim against this Defendant.[50]

In sum, it is undisputed that Texas Children's transmitted Plaintiffs' order for PediaSure timely and accurately.  Texas Children's had no duty to act as insurer or guarantor of PediaSure's quality.  Plaintiffs have failed to establish a breach of any duty owed by Texas Children's.

---

[48]     Plaintiffs' Response to Defendants' MSJ, at 7-8.

[49]     Plaintiffs' Amended Complaint, ¶ 4; *see also* Texas Children's Reply to MSJ, at 3-4.

[50]     Plaintiffs' Response to Defendants' MSJ, at 3, 8; *see also* Texas Children's Reply to MSJ, at 4.

###### ii.      Abbott and Medline

Abbott and Medline contend that Plaintiffs cannot show that they breached any duty to Plaintiffs.[51]   Negligence in the products liability context, focuses on the acts of the manufacturer to determine if it exercised ordinary care in the design, production, and sale of the product.  *See Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex. 1995).  Plaintiffs assert that Abbott and Medline owed Plaintiffs a duty to use ordinary care in the design of the PediaSure and a duty to provide PediaSure that is safe for human consumption,[52] but fail to submit any evidence of a breach of these duties by Abbott or Medline.  More specifically, Plaintiffs offer no evidence that the PediaSure at issue was defective when it left the possession of either Abbott or Medline.  Plaintiffs also fail to produce evidence that any alleged defect was caused by the lack of ordinary care by Abbott or Medline.[53]

###### iii.     UPS

Plaintiffs argue that UPS, as a common carrier, owed Plaintiffs a duty not to damage the PediaSure.[54]  Their negligence claim against UPS, to the extent not preempted, will be addressed below in connection with the question of whether UPS somehow caused or contributed to the alleged contamination of the PediaSure or that UPS caused or contributed to Plaintiffs' alleged injuries.

------

[51]      Abbott MSJ, at 12-13; *see also* Medline's Joinder in Abbott's MSJ [Doc. # 48].

[52]      Plaintiffs' Response to Defendants' MSJ, at 8.

[53]      *Id.*; *see also* Abbott's Reply to MSJ, at 4-5.

[54]      Plaintiffs' Response to Defendants' MSJ, at 7.

### b.    Common Law Requirements of Causation in Negligence Cases

### i.    General Principles

In Texas, proximate cause includes two elements—cause in fact and foreseeability. *See Gutierrez*, 106 F.3d at 687; *Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 477. "Cause in fact is 'but for cause,' meaning the negligent act or omission was a substantial factor in bringing about the injury and without which no harm would have been incurred." *Gutierrez*, 106 F.3d at 687; *accord Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994); *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex. 1988). "Cause in fact is not shown if the defendant's negligence did no more than furnish a condition that made the injury possible." *Moerbe*, 963 S.W.2d at 818; *Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 477. "Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligence created." *Gutierrez*, 106 F.3d at 687; *see Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992); *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 549-50 (Tex. 1985). It also requires "that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen." *Moerbe*, 963 S.W.2d at 818 (citing *Texas Cities Gas Co. v. Dickens*, 168 S.W.2d 208, 212 (Tex. 1943)). A plaintiff must establish proximate cause by probative evidence, not mere conjecture. *See Gutierrez*, 106 F.3d at 687.

Proximate cause is usually a mixed question of law and fact for the jury to determine. *See Cherry v. Texas Dep't of Crim. Justice*, 978 S.W.2d 240, 243 (Tex. App.—Texarkana 1998, no pet.); *United Way of San Antonio, Inc. v. Helping Hands Lifeline Found., Inc.*, 949 S.W.2d 707, 720 (Tex. App.—San Antonio 1997, writ denied); *Ely v. General Motors Corp.*, 927 S.W.2d 774, 781 (Tex. App.—Texarkana 1996, writ denied). In some circumstances, however, "a defendant may be entitled to summary judgment based on causation when the defendant's conduct is 'too remotely connected with the plaintiff's injury to constitute legal causation.'" *Id.* at 781-82 (quoting *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995)). "A lack of proximate cause may be established as a matter of law where the circumstances are such that reasonable minds could not arrive at a different conclusion." *Cherry*, 978 S.W.2d at 243; *see Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991); *Ely*, 927 S.W.2d at 781.

### ii.    Analysis

In sum, Plaintiffs are required to establish as to each Defendant against whom they assert a negligence claim, that the defendant's negligence was a cause-in-fact of the damages and injury claimed. Plaintiffs appear to claim each named Defendant's negligence contributed to the injuries in this suit. Plaintiffs' claims fail because Plaintiffs have failed to submit any evidence that the allegedly contaminated PediaSure caused Plaintiffs' injuries.[55] Plaintiffs rely on certain experts' reports as well as conclusory allegations of

---

[55]    Plaintiffs' Response to Defendants' MSJ, at 6-7. Although Plaintiffs cite to the
(continued...)

Sanchez that the PediaSure in question was contaminated with mold and that Plaintiffs suffered injuries as a result of A.S.'s alleged consumption of the product. The Court addresses the inadmissibility of the experts' opinions in Section III.D, below.[56] As explained there, Plaintiffs have not met their burden to timely produce necessary expert opinions.

As to Sanchez's personal lay opinion, the Court holds that Plaintiffs' reliance is futile. Sanchez concedes in his deposition testimony that the PediaSure ingested by A.S. bore no signs of contamination such as discoloration, odor, or foreign objects.[57] Sanchez admits that no one has ever done any scientific examination of the contents of the PediaSure cans at issue.[58] Moreover, Sanchez further acknowledged that in October 2002, he threw away all

---

[55] (...continued)
report/affidavit of Drs. Chin S. Yang and G. S. Gopalakrishna, these documents are untimely and/or unreliable and, as addressed, *infra*, fail to constitute competent summary judgment evidence. *See, infra,* at Section III.D.

[56] The deficiencies in Plaintiffs' causation proof are in addition to the lack of duty or breach of any duty discussed above. The issues regarding causation provide an alternative basis for the dismissal.

[57] Sanchez Depo., Exh. A to UPS MSJ-2, at 181-82.

[58] Sanchez testified:

> Q:   . . . Certainly to your knowledge, no one has ever done any type of scientific, medical analysis of the contents of any of the can; is that correct?
>
> A:   The contents, the inside of the can?
>
> Q:   Yes, sir.
>
> A:   To my knowledge, no one has ever done any scientific test of the contents of what's inside that can.

(continued...)

of the remaining PediaSure cans, boxes and packaging materials associated with the shipment at issue.[59]

Sanchez's unsupported lay opinion is insufficient to establish causation for a products liability claim against any Defendant. *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 713-14 (Tex. 1997), *cert. denied*, 523 U.S. 1119 (1998) (bare assertions that are not based on medical probability, but instead rely on "possibility, speculation, and surmise" are not sufficient causation evidence). Sanchez concedes that no medical professional has ever told him that the PediaSure at issue caused A.S.'s diarrhea/injuries.[60] Sanchez also admits that he has no medical or scientific training.[61] Consequently, there is no evidence that the PediaSure was contaminated; that A.S. ingested contaminated PediaSure; or that Defendants[62] caused or contributed to the alleged contamination.[63]

---

[58]     (...continued)
        *Id*. at 182-83.

[59]     *See id*. at 79-80; *see also* discussion *infra* on lack of causation in products liability context. The factual analysis there also supports the conclusion here that Plaintiffs have failed to produce any evidence of causation that satisfies the element of a negligence claim.

[60]     Sanchez Depo., Exh. A to UPS MSJ-2, at 99-100, 117, 189.

[61]     *See id*. at 220-21.

[62]     Indeed, as noted earlier in this Memorandum, with respect to Texas Children's, Sanchez testified at his deposition that he has "does not have any complaints" with Texas Children's. *See* Sanchez Depo., Exh. D to Texas Children's MSJ, at 85-86, 208-09. When asked why Texas Children's was in this lawsuit, Sanchez responded that "they're the chain of command" of "what takes place for [A.S.]." *Id*. at 208. Plaintiffs have not adduced any evidence that any act or omission by Texas Children's caused the alleged injuries to A.S.

[63]     Texas Children's Reply to MSJ, at 4-5.

Additionally, Plaintiffs have failed to offer evidence excluding other plausible causes of injury. *See Havner*, 953 S.W.2d at 720. A.S.'s alleged injury, a bout of diarrhea, could have numerous other causes other than the allegedly contaminated PediaSure. In fact, Sanchez admitted that A.S. had suffered from diarrhea just one year before the incident in question when he was taking a round of antibiotics for a virus.[64] Also, it is significant to note that when A.S. was treated at the emergency for the bout of diarrhea at issue in this case, the doctors reported that a number of children had similar problems.[65]

Sanchez's conclusory allegations do not rise above mere conjecture and speculation and fail to establish causation. *See Havner*, 953 S.W.2d at 712; *Leitch v. Hornsby*, 935 S.W.2d 114, 119 (Tex. 1996). Because Plaintiffs have failed to adduce admissible evidence that the PediaSure or Defendants' conduct caused their alleged injuries, their claims of negligence against all Defendants must be dismissed.

---

[64]     Sanchez Depo., Exh. A to UPS MSJ-2, at 100-01.

[65]     Sanchez testified:

> Q:     Did [the emergency room doctor] tell you what could have caused the condition?
>
> A:     No he just -- he told me a lot of kids were getting sick. That's all he told me, a lot of children were getting sick during that time, you know, when I took [A.S.] in. He said a lot of kids were running temperatures.

*Id.* at 122.

C.     **Strict Product Liability**

1.     **Legal Principles on Manufacturing Defect Claims**

Plaintiffs assert against Abbott a claim of strict product liability, contending that Abbott sold PediaSure in a "defective condition [that was] unreasonably dangerous and is subject to liability for physical harm thereby caused to the Plaintiff."[66] Plaintiffs thus appear to allege a manufacturing defect against Abbott.[67]

In Texas, product liability claims are analyzed under § 402A of the Restatement (Second) of Torts, which states in pertinent part:

(1)     One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user, consumer, or to his progeny, if

    (a)     the seller is engaged in the business of selling such a product;

    (b)     it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

RESTATEMENT (SECOND) OF TORTS § 402A; *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334-35 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999). "Under Texas law, a plaintiff may prevail on a manufacturing defect claim when a finished product deviates, in terms of its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous." *American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d

---

[66]     Plaintiffs' Amended Complaint, ¶ 8.

[67]     Plaintiffs do not allege a design defect, as Plaintiffs do not allege that there is a safer alternative design for the product.  Likewise, there is no allegation of a marketing defect or any alleged inadequate warnings.  *See* Abbott MSJ, at 4.

420, 434 (Tex. 1997).  To recover in a claim of manufacturing defect, the plaintiff must

show:

> . . . [1] a manufacturing flaw which renders the product unreasonably
> dangerous; [2] that the defect existed at the time the product left the seller, and
> that the defect was the producing cause of the plaintiff's injuries.  *Dico*, 953
> S.W.2d at 783 (citations omitted).
>
> An unreasonably dangerous product is one that is dangerous to an
> extent beyond that which would be contemplated by the ordinary consumer,
> with the ordinary knowledge common to the community as to its
> characteristics.  A manufacturing defect exists when a product does not
> conform to the design standards and blueprints of the manufacturer and the
> flaw makes the product more dangerous and therefore unfit for its intended or
> foreseeable uses.  The manufacturing defect theory is based upon a consumer
> expectancy that a mass-produced product will not differ from its counterparts
> in a manner which makes it more dangerous than the others.

*Id.*

In order to bring an action under strict liability, the plaintiff must demonstrate that a

defect in the defendant's products was the "producing cause" of his or her injuries.  *See Dico*

*Tire, Inc. v. Cisneros*, 953 S.W.2d 776, 783 (Tex. App.— Corpus Christi 1997, writ denied)

(citing *Ford Motor Co. v. Pool*, 688 S.W.2d 879, 881 (Tex. App.—Texarkana 1985), *aff'd*

*in part on other grounds, rev'd in part on other grounds*, 715 S.W.2d 629 (Tex.1986)).

Causation is required in all products liability cases, regardless of the theory asserted.  *See,*

*e.g., Sims v. Washex Machinery Corp.*, 932 S.W.2d 559, 562 (Tex. App.—Houston [1st Dist.]

1995, no writ) (finding that in a failure to warn products liability claim, "the failure to warn

and/or instruct must constitute a causative nexus in the product user's injury").  A producing

cause is "an efficient, exciting, contributing cause which, in a natural sequence, produced the injuries complained of." *Dico Tire, Inc.*, 953 S.W.2d at 783.

### 2.    No Evidence of Defect

Plaintiffs have no direct evidence that any of the PediaSure ingested by A.S. (or any other PediaSure cans) deviated from the specifications rendering it unreasonably dangerous. There is no dispute that no scientific testing was ever done on the containers in question. Testing became impossible when Sanchez threw the cans away.[68]   Sanchez, who admittedly has no medical, chemical, or other scientific training, cannot render an opinion about the contents' conformity to the norm or that the contents were unreasonably dangerous. *See* FED. R. EVID. 701-703; *see also Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993). There is no expert testimony—admissible or otherwise—offered on the subject.   Thus, Plaintiffs have no reliable lay expert or medical evidence regarding the contents of any PediaSure container in question.

Additionally, Plaintiffs present no circumstantial evidence of a defect.  Circumstantial evidence is admissible to show that a product was defective at the time it left the hands of the defendant manufacturer or seller. *See Darryl v. Ford Motor Co.*, 440 S.W.2d 630, 632 (Tex. 1969); *see, e.g., Walker v. Messerschmitt Bolkow Blohm GmBH*, 848 F.2d 496, 497 (5th Cir. 1988) (other accidents or injuries similar to one alleged); *Martinez*, 977 S.W.2d at 341 (subsequent remedial measures); *General Motors Corp. v. Iracheta*, 90 S.W.3d 725, 741

---

[68]      *See* Sanchez Depo., Exh. A to Abbott MSJ, at 182-83.

(Tex. App.—San Antonio 2002, pet. granted) (non-compliance with statutory safety specifications); *Parsons v. Ford Motor Co.*, 85 S.W.3d 323, 331 (Tex. App.—Austin 2002, pet. denied) (product recall letter).  Sanchez admits that he is aware of no other similar occurrence.[69]  The mere fact that an accident occurred is not sufficient proof that the product in question is defective.  *See Hernandez v. Nissan Motor Corp.*, 740 S.W.2d 894, 895 (Tex. App.—El Paso 1987, writ denied).

Even if Plaintiffs could prove that the PediaSure in question was defective when ingested by A.S., Plaintiffs do not allege or present any proof that the product was defective when it left the hands of the manufacturer, Abbott.  *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004) ("[a] plaintiff must prove that the product was defective when it left the hands of the manufacturer and that the defect was the producing cause of the plaintiff's injuries"); *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 844 (Tex. 2000).  At his deposition, Sanchez conceded that he had no evidence that the PediaSure in question was defective when it left the hands of Abbott.[70]  Because Plaintiffs have failed to demonstrate

---

[69]     Sanchez Answers to Abbott's Interrogatories, Exh. B to Abbott MSJ, at Interrogatory No. 16.

[70]     Sanchez testifies:

> Q:     I take it you have no evidence or knowledge that any such cans left Abbot[t] Laboratories or Ross Laboratories in that condition?
>
> A:     I have no evidence.  That it left the laboratory?
>
> Q:     Yes.  Or the manufacturing facility?

(continued...)

that the PediaSure in question was defective when it left the possession of Abbott, his products liability claim must fail.[71]

### 3.    No Evidence of Causation

As set forth above in Section III.B.2.b., Plaintiffs have failed to submit any evidence that an alleged defect in the PediaSure in question was the actual or producing cause of A.S.'s alleged injuries.[72] *See General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 351 (Tex. 1977); *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex. 1975). Sanchez's bare assertion that A.S.'s bout with diarrhea was caused by PediaSure is patently insufficient. Furthermore, as

---

[70]      (...continued)

A:    No. I have no evidence in that regard, no, sir.

Q:    Okay. So, in other words, you're not claiming that it left -- based on any knowledge that you have, that the Pediasure cans that you're complaining about left the manufacturing facility with, I think you used the term, green fungus or bacteria on it?

A:    I have no evidence of that.

Q:    And I take it you don't believe that happened, do you, sir?

A:    I don't believe that it happened -- I wouldn't imagine that they would do something like that.

Sanchez Depo., Exh. A to Abbott MSJ, at 174-75.

[71]    Texas Children's also maintains that Plaintiffs have failed to present any evidence that the PediaSure at issue was defective at the time it was delivered to Plaintiffs. *See Texas Children's Reply to MSJ*, at 5-6. The Court agrees that it is entirely possible that the alleged mold and fungus on the PediaSure cans grew at some point after the delivery of the cans. *See id*. In Texas, it is well settled that a product seller cannot be held liable for any injury caused by the product unless the product was defective when it was delivered. *See Murphy v. Texas Kenworth Co.*, 615 F.2d 655, 656 (5th Cir. 1980).

[72]    *See supra* at Section III.B.2.b.

discussed in Section III.D., *infra*, Plaintiffs have not offered any admissible or competent expert testimony establishing a causal link that is scientifically reliable.[73]

Additionally, Plaintiffs have failed to exclude other plausible causes for A.S.'s injuries. *See Havner*, 953 S.W.2d at 720. Indeed, as noted above, A.S. had previously suffered a bout with diarrhea when he was taking antibiotics.[74] Further, the emergency room doctor told Sanchez at the time he was treating A.S. for the diarrhea allegedly caused by the PediaSure, that a number of children were sick at that time.[75]

---

[73]    The Court strikes Plaintiffs' experts' report and affidavit. *See infra* at Section III.D. Moreover, Sanchez acknowledged in his deposition:

> Q:    Did [Dr. Hausinger, A.S.'s primary care physician] ever tell you that the contamination you explained to us earlier on the Pediasure could have caused this diarrhea?
>
> A:    No, she did not.
>
> Q:    Did anyone in her office tell you that?
>
> A:    No.

> \*   \*   \*   \*

> Q:    My question was:  Did Dr. [Gopalakrishna] or any other doctor ever tell you within -- within a medical degree of probability, that [A.S.'s] diarrhea was caused by Pediasure?
>
> A:    No, he did not.

Sanchez Depo., Exh. A to Abbott MSJ, at 117, 189.

[74]    Sanchez Depo., Exh. A to UPS MSJ-2, at 100-01; *see supra* at Section III.B.2.b.

[75]    Sanchez Depo., Exh. A to Abbott MSJ, at 122.

Finally, Plaintiffs have failed to prove that any of the allegedly defective containers of PediaSure was ingested by A.S.  Sanchez testified at his deposition regarding "black specks" that were on the top of the PediaSure containers, and he identified these "black specks" as the alleged contaminants.[76]  Sanchez admitted, however, that none of these "black specks" were ever put into A.S.'s feeding tube.[77]  He further agreed that none of the PediaSure that was put into A.S.'s feeding tube was discolored or had any odor.[78]  Because

---

[76]     *Id*. at 181-82.

[77]     *Id*. at 182.

[78]     Sanchez testified:

> Q:     I take it from your testimony in response to Mr. Gilmour's [counsel for Texas Children's] questions that whenever -- the Pediasure from the batches, I think it was, the Cases 1, 2 and part of 3 that you actually used and that you actually put into the feeding tube process, did not have any funny smell or odors, correct?
>
> A:     Correct.
>
> Q:     Did not have any discoloration?
>
> A:     Correct.
>
> Q:     All right.  Did not -- you did not see any specks of mold or fungus or anything else going into that feeding tube, did you, sir?
>
> A:     I can't say that I did --
>
> Q:     Okay.  Certainly you --
>
> A:     -- that I saw specks of anything?
>
> Q:     Yes, sir.
>
> A:     Whether they were white, yellow.

(continued...)

there is no evidence of causation, all Plaintiffs' strict product liability claims against all Defendants fail as a matter of law. *See Havner*, 953 S.W.2d at 713-14.

### D.    Challenges to Plaintiffs' Expert Witnesses

#### 1.    Dr. Chin S. Yang, Ph.D.

Dr. Chin S. Yang, Ph.D., opines that there were high concentrations and levels of fungi and bacteria found on the surface of the PediaSure cans provided by Sanchez to him and that such conditions "suggesting that secondary contamination was probable."[79]   Dr. Yang also opines that the "results indicate the Pediasure [sic] cans were contaminated because of water damage."[80]   In a joint motion, UPS, Abbott, and Texas Children's seek to exclude the testimony of Dr. Yang, pursuant to Federal Rule of Evidence 702 and the principles of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993), and its

---

[78]    (...continued)

> Q:    The black specks that you talked about earlier today that were on top of the cans --
>
> A:    Yeah.
>
> Q:    -- you never saw any such black specks going into the feeding tube?
>
> A:    No, no.

*Id.* at 181-82; *see also* Abbott's Reply to MSJ, at 2-3.

[79]    Dr. Yang's Report, Dec. 16, 2003 ("Dr. Yang's Report"), Exh. B to Defendants' Joint Motion to Exclude, at 2, 3.

[80]    *Id.*

progeny.[81]   Specifically, Defendants argue that exclusion of Dr. Yang's testimony is warranted and necessary on the grounds that:  (1) he is unqualified to render the opinions he offers because his degree from the Department of Forest and Environmental Biology (microbiologist) did not provide him with the requisite experience, training, or background to testify on the medical causation issues in this case; and (2) his opinions are not relevant or reliable because:  (a) he did not test the contents of any cans of PediaSure that were allegedly administered to A.S. or any cans of PediaSure at all; and (b) he failed to rule out alternate possible causes of A.S.'s alleged injuries.[82]

### a.        General Principles

"[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify . . . in the form of an opinion or otherwise."  FED. R. EVID. 702.  The trial judge must determine as an initial matter whether the proffered witness is qualified to give the expert opinion he seeks to express.  *See, e.g., Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156-57 (1999).  In other words, the Court must assess also "'whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case.'" *Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999) (quoting *Kumho Tire Co.*, 526 U.S. at 156-57); *see also Daubert*, 509 U.S. at 589.

If the trial judge determines that the witness is qualified as an expert in the relevant field, then the judge must then pre-screen the expert witness's proffered opinions to ensure

---

[81]      Defendants' Joint Motion to Exclude, at 2-8.

[82]      *See id.* at 2-3.

that they comply with other requirements of Rule 702 of the Federal Rules of Evidence. Rule 702 of the Federal Rules of Evidence, as effective since December 1, 2000, provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 "imposes a special obligation upon a trial judge to ensure that any and all [expert] testimony . . . is not only relevant, but reliable." *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 580-81 (5th Cir. 2001) (citing *Kumho Tire Co.*, 526 U.S. at 147).

The proponent of the expert testimony "must prove by a preponderance of the evidence that the testimony is reliable." *Riddell Sports, Inc.*, 242 F.3d at 581 (citing *Tanner*, 174 F.3d at 547). "Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under FED. R. EVID. 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir.), *cert. denied*, 531 U.S. 812 (2000). According to the United States Supreme Court, expert testimony is admissible only (1) if it qualifies as scientific, technical or other specialized knowledge and (2) if it will assist the trier of fact to understand the evidence or resolve a disputed factual issue. *See Kumho Tire Co.*, 526 U.S. at 147; *Daubert*, 509 U.S. at 589; *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). In other words, the testimony must be reliable and relevant. *See Tanner*, 174 F.3d at 546.

Reliability and validity do not require certainty, but must be demonstrated by evidence that the knowledge is more than speculation. *See Daubert*, 509 U.S. at 590. The Court must consider (1) the validity of the scientific principles used; (2) the accuracy of the data relied upon by the expert; and (3) the correctness of the application of the scientific principles to the relevant data. *See Watkins*, 121 F.3d at 989; *Marcel v. Placid Oil Co.*, 11 F.3d 563, 567 (5th Cir. 1994). Four factors to consider in determining the reliability of proffered scientific evidence are: (1) whether the theory or procedure has been subjected to testing; (2) whether it has been subjected to peer review and publication; (3) the rate of error and the existence of standards controlling the theory or procedure; and (4) whether it has attained general acceptance. *See Watkins*, 121 F.3d at 989; *see also Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 & n.15 (5th Cir. 2002).

The principles announced in *Daubert* regarding the admission of scientific testimony also apply to technical or specialized expert testimony. *See Black v. Food Lion, Inc.*, 171 F.3d 308, 310 (5th Cir. 1999). "[T]he *Daubert* inquiry is always fact specific, and that the *Daubert* factors may not all apply . . . ." *Id*. at 311. Rather, the factors considered in *Daubert* "may be used as a starting-point for analysis" of purported non-scientific technical or specialized expert testimony." *Id.*

The Fifth Circuit has outlined specific guidelines for addressing expert testimony in cases involving medical causation. It has stated that:

> The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological processes by which a particular disease or syndrome develops and knows what factors cause the process to

> occur. Based on such predicate knowledge, it may then be possible to fasten
> legal liability for a person's disease or injury.

*Id.* at 314. Given the specialized and technical nature of medicine, courts have ruled that not

every licensed medical doctor is automatically qualified to testify as an expert on every

medical question. *See Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). "The questions

. . . do not stop if the expert has an M.D. degree. That alone is not enough to qualify him to

give an opinion on every conceivable medical question. This is because the inquiry must

be into actual qualification—sufficient to assist the trier of fact." *Christophersen v. Allied-

Signal Corp.*, 939 F.2d 1106, 1112-13 (5th Cir. 1991), *cert. denied*, 503 U.S. 912 (1992).

Thus, "the proponent of the testimony has the burden to show that the expert 'possess[es]

special knowledge as to the very matter on which he proposes to give an opinion.'" *Broders*,

924 S.W.2d at 153-54 (quoting 2 Ray, TEXAS LAW OF EVIDENCE: CIVIL AND CRIMINAL §

1401 at 32 (Texas Practice 3d ed. 1980)).

### b.    Analysis

In this case, Dr. Yang reports that on October 18, 2001, he received five unopened

cans of PediaSure from Plaintiffs' attorney.[83] Dr. Yang collected and analyzed one swab

sample from the outside surface of each can of PediaSure.[84] Dr. Yang concluded that swab

samples yielded data suggesting fungal growth, contamination, or both.[85] Dr. Yang further

---

[83]    Dr. Yang's Report, Exh. B to Defendants' Joint Motion to Exclude, at 2.

[84]    *Id.*

[85]    *Id.* at 3.

reported that the results suggested some bacterial growth, contamination, or both.[86] According to Dr. Yang, the results "indicated" that the outside surface of the PediaSure cans were contaminated because of water damage.[87] He did not analyze the contents of any of the cans.[88] Dr. Yang did not examine A.S., A.S.'s medical records, the PediaSure actually ingested by A.S., or any of the empty cans that had contained the PediaSure given to A.S.[89] In his report, Dr. Yang offers no opinion as to the cause of A.S.'s injuries.[90] In fact, Dr. Yang makes no mention of Plaintiffs at all.[91] He simply analyzed the outside surface of five cans of PediaSure and reported his results.[92]

Plaintiffs appear to offer Dr. Yang as an expert on causation of A.S.'s injuries based on Dr. Yang's opinion that "[t]he health effects of myotoxins by ingestion are well documented in the scientific literature."[93] His testimony is inadmissible for the purpose of medical causation. Dr. Yang is not a medical doctor, not a licensed physician, and has never

---

[86]   *Id.*

[87]   *Id.*

[88]   *Id.* at 1-4.

[89]   *Id.*

[90]   *Id.*

[91]   *Id.* at 2-3.

[92]   *Id.*

[93]   *Id.* at 3.

practiced medicine in any capacity.[94]  He holds a Ph.D. earned in 1984 from the Department of Forest and Environmental Biology at the State University of New York.[95]  He is a microbiologist by training and experience.  Dr. Yang is not qualified to give any medical causation opinion on A.S.'s injuries.[96]

In addition, Dr. Yang's opinions are also unreliable and not relevant because they are not based on sufficient facts or data.  Dr. Yang did not conduct any testing on the allegedly harmful or defective product.  He did not test the contents of any PediaSure can, much less the cans allegedly ingested by A.S.  The only data Dr. Yang reviewed were laboratory results and associated records of swabs of material on the outside surface of cans different from those that contained the substance A.S. ingested, although the cans were in the same batch or shipment to Sanchez.  Moreover, Dr. Yang has not considered any other potential causes of A.S.'s injuries (*e.g.*, medication or viral infection) and has no basis to testify that the PediaSure was more likely to have caused A.S.'s injuries than any other potential cause.  Dr.

---

[94]    Dr. Yang's Report, Exh. B to Defendants' Joint Motion to Exclude, at 1; *see also* Dr. Yang's *Curriculum Vitae*, Exh. C. to Defendants' Joint Motion to Exclude.

[95]    Dr. Yang's Report, Exh. B to Defendants' Joint Motion to Exclude, at 1; *see also* Dr. Yang's *Curriculum Vitae*, Exh. C to Defendants' Joint Motion to Exclude.

[96]    Plaintiffs appear to concede that Dr. Yang is not qualified to testify as to medical causation. *See* Plaintiffs' Response to Defendants' Joint Motion to Exclude, at 6-7.  In their response to Defendants' motion to exclude, Plaintiffs assert that Dr. Gopalakrishna, not Dr. Yang, has testified as to the medical cause of A.S.'s injuries.  Thus, Plaintiffs urge that Defendants' contentions regarding Dr. Yang's qualifications to opine on medical causation are "largely irrelevant." *Id.* at 6.

Yang's testimony thus fails to meet applicable standards for expert testimony under *Daubert* and Rule 702 for the purposes of Plaintiffs offer.

Plaintiffs simply contend that Dr. Yang's report "reliably establishes the presence of contaminants on the cans in the batch of the PediaSure in question" and "speaks to the general health issues that result from the presence of such contaminants in food products."[97] This testimony does not save Plaintiffs' claims. Plaintiffs fail to suggest, let alone provide evidence to demonstrate how the exterior of a can could cause the injuries A.S. allegedly suffered. For instance, Dr. Yang did no testing or analysis of the metal from the PediaSure cans that A.S. ingested or others delivered to his home; nor did he test the integrity of the seals of these containers. Likewise, he conducted no testing on the contents of the PediaSure cans allegedly ingested by A.S.[98]

Recognizing these deficiencies, Plaintiffs belatedly argue that there were contaminants on the fold-in tab used to open the PediaSure containers and that such contaminants would

---

[97]   *Id.* at 7.

[98]   In addition to throwing away the cans containing the product ingested by A.S., Sanchez inexplicably destroyed all of the PediaSure cans from the batch at issue after Dr. Yang tested five of the cans, even though Plaintiff already contemplated filing this lawsuit. *See* Sanchez Depo., Exh. A to Defendants' Joint Motion to Exclude, at 79-81; Plaintiffs' Response to Texas Children's First Set of Requests for Production, Exh. 4 to Texas Children's Reply to Defendants' Joint Motion to Exclude, at 10-11. In situations such as this one, where a plaintiff attempts to use destroyed evidence against a defendant, the defendant is at a severe disadvantage. *See Trevino v. Ortego*, 969 S.W.2d 950, 960 (Tex. 1998). Defendants are unable to recreate or confirm Dr. Yang's results or submit cans for independent testing of the contents. Hence, Plaintiffs' failure to preserve the cans ingested by A.S., the cans tested by Dr. Yang and the remaining cans in the batch of PediaSure at issue provides an additional basis to question and exclude the testimony of Dr. Yang.

be "almost certain to reach the product when used."[99] This "theory" is rejected as unsupported by any evidence – either factual, scientific, and/or expert opinion.  Even if the Court assumes that A.S. ingested the contents of the cans whose outsides were the same as those that were tested and found to be contaminated, this theory flatly contradicts Sanchez's clear deposition testimony.[100]   Additionally, Sanchez testified that none of the cans he actually fed to A.S. had any foul smell or odor, were discolored in any way, or contained any of the alleged "black specks" of mold or fungus.  He admitted they bore no signs of contamination.[101]  Dr. Yang's opinion provides no basis for the causation finding required by Plaintiffs' causes of action.

Further, Dr. Yang provides no factual basis for any opinions about when the mold, fungus, and contaminants on the outside of the PediaSure cans first appeared.  There is no basis in the record for the inference that the cans contained these contaminants when they were delivered to Plaintiffs, as opposed to growing while the cans were stored at Plaintiffs'

---

[99]   Plaintiffs' Supp. Response to Defendants' Joint Motion to Exclude, at 2.

[100]   Sanchez states in his deposition:

> Q:   Tell me what you did with each can as you used it.  I know you mentioned earlier that you would take it, wipe it down and rinse it; is that correct?

> A:   Always.  We have to wash our hands and everything, the can.  When we get the can, we will wash the top of the lid.  We will -- you know, basically I wet it and then I dry it off with a paper towel and pour it into a bag.  That's the procedure.

Sanchez Depo., Exh. A to Defendants' Joint Motion to Exclude, at 65.

[101]   *Id.* at 181-82.

house. Indeed, Dr. Yang does not testify that the mold and fungus that he observed was present prior to A.S.'s bout with diarrhea.[102]

Plaintiffs have not met their burden of proving that Dr. Yang's expert testimony is reliable and relevant, or that he is qualified to give any opinion relevant to the issues in this case. His opinion testimony is not admissible.

### 2. Dr. G. S. Gopalakrishna's Affidavit

Plaintiffs offer in response to the pending summary judgment motions, the affidavit of Dr. G. S. Gopalakrishna, a pediatric gastroenterologist, to establish medical causation for the injuries Plaintiffs claim A.S. sustained from the PediaSure administered to him in September 2001.[103]   Texas Children's, Abbott, and Medline seek to strike this affidavit, claiming that it is untimely, improper, and substantively inadmissible.[104]   The Court concludes that the affidavit is untimely procedurally and, substantively, Dr. Gopalakrishna's opinion of medical causation is not admissible.

---

[102]   Dr. Yang also does not identify the source of the alleged water damage which would inform the question of what caused the mold and fungus growths. *See* Dr. Yang's Report, Exh. B to Defendants' Joint Motion to Exclude, at 3.

[103]   Dr. Gopalakrishna's Affidavit, June 7, 2004 ("Dr. Gopalakrishna's Affidavit"), Exh. E to Plaintiffs' Response to Defendants' MSJ.

[104]   Texas Children's Motion to Strike, at 2-7; Abbott's Motion to Strike, at 2-7; Medline's joinder in Support of Abbott's Motion to Strike [Doc. # 67]. Because the motions are almost identical, the Court will cite only to one, Texas Children's, as it was the first docketed. Although the parties in their Joint Case Status Report [Doc. # 68], stated that UPS also filed a Motion to Strike Dr. Gopalakrishna's Affidavit, none appears to have been docketed. Nevertheless, the Court's findings as to this expert are applicable to UPS.

### a.    Failure to Timely or Adequately Designate

Dr. Gopalakrishna, based on his review of A.S.'s medical records and the report and opinion of Dr. Yang, that there were "such high concentrations of fungi and bacteria suggest [sic] probable secondary contamination to Plaintiff A.S.," opines that: "with a reasonable degree of medical certainty that Plaintiff A.S.'s severe and explosive bouts of diarrhea was [sic] caused by the significantly high concentrations and levels of fungi and bacteria detected in Dr. Yang's report."[105] Defendants respond that procedurally, Dr. Gopalakrishna's opinions are not timely .

It is clear that Dr. Gopalakrishna was not designated as an expert on causation.[106] Defendants further assert that Plaintiffs failed to provide a timely expert report from Dr. Gopalakrishna on causation (or any other matter).[107]  Plaintiffs' deadline to designate expert witnesses and provide an expert report was November 3, 2003.[108]  Plaintiffs timely designated Dr. Gopalakrishna as A.S.'s treating physician and a non-retained testifying expert.[109] "[A] treating physician generally must be considered an ordinary fact witness, and should not be considered an expert unless the physician has been *specifically retained* to

---

[105]    Dr. Gopalakrishna's Affidavit, Exh. E to Plaintiffs' Response to Defendants' MSJ, ¶¶ 6, 7. Dr. Gopalakrishna also states that the diarrhea was not caused by any antibiotics that A.S. may have been taking at the time. *Id.* ¶ 8.

[106]    Texas Children's Motion to Strike, at 2; *see also* Plaintiffs' Expert Designation, Exh. A to Texas Children's Motion to Strike, at 2-3.

[107]    Texas Children's Motion to Strike, at 2.

[108]    Amended Docket Control Order signed Dec. 1, 2003 [Doc. # 32].

[109]    Plaintiffs' Expert Designation, Exh. A to Texas Children's Motion to Strike, at 3.

develop an expert opinion." *Young v. United States*, 181 F.R.D. 344, 346 (W.D. Tex. 1997) (emphasis in original). "Unless he has also been specifically retained as an expert, a treating physician's testimony is based on the physician's personal knowledge of the examination, diagnosis and treatment of a patient." *Id*. "He cannot, however, be asked to answer questions about medical issues not involved in his diagnosis and treatment." *Id*. at 346-47; *see also Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 882-84 (5th Cir. 2004); *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 755-58 & nn.2, 3 (7th Cir. 2004); *Meister v. Medical Eng'g Corp.*, 267 F.3d 1123, 1131-32 (D.C. Cir. 2001);

According to Dr. Gopalakrishna's records, he periodically saw A.S. from September 1994 to February 2004, but did not see him between June 2001 and March 2002.[110] Plaintiffs' claims are founded on bouts of diarrhea in September and October 2001. Here, as a non-retained treating physician, Dr. Gopalakrishna's testimony is limited to the issues he could and did address in his treatment of A.S. In contrast, Dr. Gopalakrishna admits that his opinion is based solely upon the medical records from A.S.'s primary care physician, Dr. Hausinger, and Dr. Yang's report.[111] None of these materials are within Dr. Gopalakrishna's personal knowledge based on, nor part of, his examination, diagnosis, and treatment of

---

[110]   Dr. Gopalakrishna's Medical Records for A.S., Exh. B to Texas Children's Motion to Strike. Although in his affidavit, Dr. Gopalakrishna claims he treated A.S. during his illness in the Fall 2001, the only record contained in Dr. Gopalakrishna's file during the relevant time period is a laboratory report dated October 15, 2001, from Texas Children's, indicating that a stool sample did not contain salmonella, ova, or parasites. *See id.*; *see also* Dr. Gopalakrishna's Affidavit, Exh. E to Plaintiffs' Response to Defendants' MSJ, ¶ 2.

[111]   Dr. Gopalakrishna's Affidavit, Exh. E to Plaintiffs' Response to Defendants' MSJ, ¶¶ 5-6.

A.S.[112]  The causation opinion goes well beyond his work as a treating physician and would have to be presented in a formal expert report.  Plaintiffs have not done so.  It is far too late to attempt to expand Dr. Gopalakrisna's role now.  *See Southwestern Bell Telephone Co. v. City of El Paso*, 346 F.3d 541, 546 (5th Cir. 2003) (citing *S & W Enters., L.L.C. v. Southtrust Bank of Ala., NA,* 315 F.3d 533, 535 (5th Cir. 2003)) (FED. R. CIV. P. 16(b) provides that a scheduling order "shall not be modified except upon a showing of good cause and by leave of the district judge," and the good cause standard requires the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension (citations omitted)).

### b.      Unreliability of Affidavit

Defendants argue that Dr. Gopalakrishna's causation opinions must be stricken because  the bases for these views are unreliable, if not irrelevant.  Dr. Gopalakrishna bases his opinion on his own medical records of A.S., those of Dr. Hausinger, and the report of Dr. Yang.  As noted above, Dr. Gopalakrishna opines "that Plaintiff A.S.'s severe and explosive

---

[112]     Additionally, even if Dr. Gopalakrishna had relevant knowledge regarding medical causation of A.S.'s injuries, Dr. Gopalakrishna's affidavit is precluded because Plaintiffs failed to timely provide an expert report addressing the same.  *See* Rule 26(a)(2)(B); *see also Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 603-04 (S.D. Tex. 2001) (Jack, J.) (excluding experts' opinions due to party's failure to produce expert report and failure to list all opinions in a second expert's existing report).  Plaintiffs produced Dr. Gopalakrishna's affidavit, which is dated June 7, 2004, as an exhibit to Plaintiffs' Response to Defendants' motions for summary judgment, which also was file on June 7, 2004.  *See* Dr. Gopalakrishna's Affidavit, Exh. E to Plaintiffs' Response to Defendants' MSJ.

bouts of diarrhea was [sic] caused by the significantly high concentrations and levels of fungi and bacteria detected in Dr. Yang's report."[113]

Because Dr. Yang's report is unreliable, in that Dr. Yang did not test pertinent items including the PediaSure in issue or even the cans containing the substance A.S. ingested, and Dr. Gopalakrishna neither conducted any independent testing of the PediaSure at issue, nor consulted with anyone who conducted independent testing of the contents of the PediaSure cans, Dr. Gopalakrishna's conclusory statement regarding medical causation has not been shown to be scientifically reliable. "A claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *See, e.g., Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999) (citing *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726-727 (Tex. 1998) (citing *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997))). *Daubert* and its progeny require more for an opinion to be reliable.[114] *See Kumho Tire Co.*, 526 U.S. at 146-47; *Daubert*, 509 U.S. at 589; *see also Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict"); *Havner*, 953 S.W.2d at 720 ("[a] physician, even a treating physician, or other expert who has seen a skewed data sample . . . is not in a position to infer causation"). To the extent not based on Dr. Yang's flawed analysis and opinions, Dr. Gopalakrishna's affidavit supplies no meaningful basis for his

---

[113]   Dr. Gopalakrishna's Affidavit, Exh. E to Plaintiffs' Response to Defendants' MSJ, ¶ 7.

[114]   *See supra* at Section III.D.1.

medical causation opinion and appears merely to presume the causal connection between the PediaSure and A.S.'s claimed injuries. This evidence is inadmissible, *see generally Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir.), *cert. denied*, 526 U.S. 1064 (1998), and Dr. Gopalakrishna's affidavit is stricken.[115]

Therefore, Plaintiffs have failed to present admissible expert testimony on medical causation for the injuries and damages Plaintiffs claim.

## IV.   CONCLUSION

The Court concludes that Plaintiffs have failed to present admissible expert testimony and have failed to raise an issue of material fact as to their claims for negligence and strict products liability. It is therefore

**ORDERED** that Defendants' motions for summary judgment [Docs. ## 24, 47, 48, 49, 52] are **GRANTED**. It is further

**ORDERED** that Defendants' joint motion to exclude the testimony of Dr. Yang [Doc. # 50] is **GRANTED**.   It is further

**ORDERED** that Defendants' motions to strike the affidavit of Dr. Gopalakrishna [Docs. ## 63, 65, 67] are **GRANTED**.

The Court will enter a separate final judgment.

---

[115]   Even if the Court had allowed the testimony of Dr. Yang and affidavit of Dr. Gopalakrishna, Plaintiffs case would still fail as they have proffered no evidence of contamination of the actually ingested contents. Neither Dr. Yang nor any other expert for Plaintiffs has ever tested the contents of the PediaSure containers ingested by A.S., and such cans can never be tested as Sanchez disposed of all the cans in question.

**SIGNED** at Houston, Texas, on this the ___17th___ day of September, 2004.

NANCY F. ATLAS
UNITED STATES DISTRICT JUDGE